**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| SUBASH SUBRAMANIAN, derivatively on behalf of MICROSOFT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>SATYA NADELLA, AMY E. HOOD, JARED SPATARO, RAJESH JHA, REID HOFFMAN, HUGH JOHNSTON, TERI LIST, CATHERINE MACGREGOR, MARK MASON, SANDRA E. PETERSON, PENNY PRITZKER, JOHN DAVID RAINEY, CARLOS A. RODRIGUEZ, CHARLES W. SCHARF, JOHN W. STANTON, JOHN W. THOMPSON, EMMA WALMSLEY, and PADMASREE WARRIOR,<br><br>Defendants,<br><br>and<br><br>MICROSOFT CORPORATION,<br><br>Nominal Defendant. | Case No.: 2:26-cv-3751<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

## INTRODUCTION

Plaintiff Subash Subramanian ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant Microsoft Corporation ("Microsoft" or the "Company"), submits this Verified Shareholder Derivative Complaint against Defendants (defined below) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Microsoft with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Microsoft; (iii) public filings in a securities class action against the Company's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Chief Marketing Officer, AI at Work ("AI CMO"), and former Executive Vice President, Experiences and Devices ("EVP E&D") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between May 1, 2025 and January 28, 2026, with respect to Microsoft's business, operations, and prospects;[1] (iv) public filings in several copyright infringement actions in which Microsoft is named as a defendant; and (v) other publicly available information concerning Microsoft.

## NATURE OF THE ACTION

1. This is a stockholder derivative action asserted on behalf of Nominal Defendant Microsoft against certain officers and the members of the Company's board of directors ("Board") to recover damages caused to the Company for wrongdoing beginning on January 1, 2022 and continuing through the present date (the "Relevant Period").

2. Microsoft is one of the world's largest technology conglomerates. In recent years, Microsoft's growth has primarily been powered by the success of its cloud computing platform, Azure, into which the Company has increasingly incorporated a host of artificial intelligence ("AI")

---

[1] *City of St. Clair Shores Police and Fire Retirement System v. Microsoft Corporation et al.*, C.A. No. 2:26-cv-02071 (W.D.W.A.) (the "Securities Class Action").



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

capabilities. The Company has routinely emphasized the importance of AI to its business and prospects.

3. Microsoft has made and continues to make billions of dollars' worth of investments in its own proprietary generative AI chatbot, Copilot, as well as the AI technology of other companies, including OpenAI. The Company has incorporated other companies' technology into Copilot and released multiple versions of Copilot, offering some Copilot features for free while charging users for additional premium features.

4. Defendants have consistently portrayed Microsoft's massive investments in other companies' AI technology as consistent with the success of Azure and beneficial to the Company and have touted Copilot as a market leader and the chatbot of choice for many large businesses. In reality, Microsoft has been collaborating with its partner, OpenAI, in unlawfully misappropriating copyrighted material to train OpenAI's large language models ("LLM"s). At the same time, the Company has been diverting both central processing unit ("CPU") and graphics processing unit ("GPU") capacity from Azure in an effort to address significant competitive challenges faced by its own AI chatbot, Copilot. The Company has also made massive capital expenditures on Copilot and on AI-related research and development. This led to a sudden slowdown in the growth of Azure and, once the adverse information detailed herein was revealed to the public, a sharp decline in the Company's share price.

5. Defendants have approved, and continue to authorize, massive reciprocal investments with OpenAI, developed the computing infrastructure on which OpenAI's LLMs operate, and assisted OpenAI in unlawfully misappropriating copyrighted material to train these LLMs. In so doing, the Individual Defendants (defined herein) have abdicated their duties to exercise proper oversight of material risks to the Company and subjected the Company to multiple lawsuits that pose a threat of significant liability for Microsoft. In authorizing and participating in this unlawful conduct, the Individual Defendants have breached their fiduciary duties to exercise candor, good faith, and loyalty in the management and administration of Microsoft's business and affairs.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

6. Further, between May 1, 2025 and January 28, 2026, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, among other things, that: (i) Copilot was experiencing significant problems with brand positioning, user experience, usage, data siloing, computational capacity, organizational, and interoperability; (ii) Copilot was not a market leader, but in fact was substantially behind its competitors as measured by numerous benchmark tests; (iii) Microsoft had failed to convert a significant percentage of its commercial Microsoft 365 users to paid Copilot subscriptions and Copilot was increasingly losing market share to rival products; and (iv) because of Copilot's inferior competitive positioning, Microsoft was diverting billions in capital expenditures and CPU and GPU capacity towards Copilot and AI-related research and development and away from fulfilling demand for its profitable Azure services. As a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects between May 1, 2025 and January 28, 2026 were materially false, misleading, and lacked a reasonable basis.

7. As a direct and proximate result of the misconduct described herein by the Individual Defendants, Microsoft has sustained significant damages as explained below.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and SEC Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9. This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

jurisdiction over the Nominal Defendant because it is headquartered in this state and has consented to service in this state.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Microsoft. Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant Microsoft could have sued the same Defendants in this District.

## PARTIES

11. Plaintiff is a Microsoft stockholder and has continuously held Microsoft stock from the time of the wrongdoing alleged herein until the present. Plaintiff will fairly and adequately represent Microsoft's interest in this action.

12. Nominal Defendant Microsoft is a multinational technology conglomerate incorporated under the laws of the State of Washington, and its principal executive offices are located in Redmond, Washington. Microsoft's common stock trades on the Nasdaq exchange under the symbol "MSFT."

13. Defendant Satya Nadella ("Nadella") has served as Microsoft's CEO and Chairman of the Board since 2014. Microsoft paid defendant Nadella total compensation of $96,496,790 in fiscal year 2025 ("FY 2025").[2]

14. Defendant Amy E. Hood ("Hood") has served as Microsoft's CFO since 2013. Microsoft paid defendant Hood total compensation of $29,481,551 in FY 2025.

15. Defendant Jared Spataro ("Spataro") has served as Microsoft's AI CMO since 2023.

16. Defendant Rajesh Jha ("Jha") served as Microsoft's EVP E&D at all relevant times to the misconduct complained of herein. On March 12, 2026, the Company announced that after 35 years with the Company, Jha would retire from his role on July 1, 2026. Jha remains employed by Microsoft in an advisory role.

---

[2] Microsoft's FY 2025 began on July 1, 2024 and ended on June 30, 2025.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

17. Defendant Reid Hoffman ("Hoffman") has served as a member of the Board since 2017. Microsoft paid defendant Hoffman total compensation of $367,500 in FY 2025.

18. Defendant Hugh Johnston ("Johnston") has served as a member of the Board since 2017. During the Relevant Period, Johnston served as Chair of the Audit Committee. Microsoft paid defendant Johnston total compensation of $412,500 in FY 2025.

19. Defendant Teri List ("List") has served as a member of the Board since 2014. During the Relevant Period, List served as a member of the Audit Committee and the Governance and Nominating Committee (the "Governance Committee"). Microsoft paid defendant List total compensation of $397,500 in FY 2025.

20. Defendant Catherine MacGregor ("MacGregor") has served as a member of the Board since 2023. During the Relevant Period, MacGregor served as a member of the Compensation Committee. Microsoft paid defendant MacGregor total compensation of $367,500 in FY 2025.

21. Defendant Mark Mason ("Mason") has served as a member of the Board since 2023. During the Relevant Period, Mason served as a member of the Governance Committee.

22. Defendant Sandra E. Peterson ("Peterson") has served as a member of the Board since 2015. During the Relevant Period, Peterson served as both Chair and member of the Governance Committee and the Compensation Committee. Microsoft paid defendant Peterson total compensation of $457,500 in FY 2025.

23. Defendant Penny Pritzker ("Pritzker") has served as a member of the Board since 2017. Microsoft paid defendant Pritzker total compensation of $392,500 in FY 2025.

24. Defendant John David Rainey ("Rainey") has served as a member of the Board since December 5, 2025, when he was elected following the resignation of Defendant Rodriguez.

25. Defendant Carlos A. Rodriguez ("Rodriguez") served as a member of the Board from 2021 until December 5, 2025, when he decided not to seek re-election to the Board at the Company's 2025 annual meeting. During the Relevant Period, Rodriguez served as Chair of the Compensation



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

Committee and as a member of the Audit Committee. Microsoft paid defendant Rodriguez total compensation of $417,500 in FY 2025.

26. Defendant Charles W. Scharf ("Scharf") has served as a member of the Board since 2014. During the Relevant Period, Scharf served as a member of the Compensation Committee and the Governance Committee. Microsoft paid defendant Scharf total compensation of $367,500 in FY 2025.

27. Defendant John W. Stanton ("Stanton") has served as a member of the Board since 2014. During the Relevant Period, Stanton served as a member of the Audit Committee. Microsoft paid defendant Stanton total compensation of $397,500 in FY 2025.

28. Defendant John W. Thompson ("Thompson") served as a member of the Board from 2012 until December 7, 2023, when he decided not to seek re-election to the Board at the Company's 2023 annual meeting. During the Relevant Period, Thompson served as Chair and member of the Governance Committee.

29. Defendant Emma Walmsley ("Walmsley") has served as a member of the Board since 2019. During the Relevant Period, Walmsley served as a member of the Compensation Committee. Microsoft paid defendant Walmsley total compensation of $367,500 in FY 2025.

30. Defendant Padmasree Warrior ("Warrior") served as a member of the Board from 2015 until December 7, 2023, when she decided not to seek re-election to the Board at the Company's 2023 annual meeting. During the Relevant Period, Warrior served as a member of the Compensation Committee.

31. Defendants Nadella, Hood, Spataro, Jha, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzker, Rainey, Rodriguez, Scharf, Stanton, Thompson, Walmsley, and Warrior are referred to collectively herein as the "Individual Defendants"

32. The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

33. At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Microsoft.

34. Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

35. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

36. Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

37. Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

38. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Microsoft were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;
- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and
- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

39. The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

40. Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Microsoft.

41. The Board has adopted Microsoft's Standards of Business Conduct (the "Trust Code") to deter wrongdoing, which imposes additional duties and responsibilities on the Individual Defendants, including the following:



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

- **HONOR PRIVACY.** We honor privacy by being transparent about how we handle customer data, including personal data. We want our customers to trust us to protect their privacy and use their data in the ways that they permit us.
- **BUILD SECURE PRODUCTS AND SERVICES.** We are committed to designing, building, testing, and operating our technology to ensure we deliver solutions that meet the highest possible standard of security. We strive to ensure that all aspects of customer data remain confidential, that data integrity and security is maintained, and that our business functions operate effectively and resist attacks. We all bear the responsibility to directly contribute to the security of Microsoft and our customers.
- **RESPECT LAWS AROUND THE WORLD.** We operate around the globe and commit to respecting the laws wherever we do business. This helps us to build trust with governments, strengthen the communities where we live and work, and contribute to a fair society where we enjoy the protection of these same laws.
- **DEVELOP AND DEPLOY RESPONSIBLE AI.** We are committed to developing and deploying AI technologies in a way that is consistent with our AI principles, Responsible AI Standard, our company mission, values, and our commitment to human rights. We strive to create systems that people trust. This means keeping people and their goals at the center of system design decisions and respecting enduring values like fairness, reliability and safety, privacy and security, inclusiveness, transparency, and accountability.
- **AVOID CONFLICTS OF INTEREST.** Conflicts of interest can arise when our personal relationships or financial interests overlap with our job



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

responsibilities. If we don't navigate potential conflicts of interest carefully, these situations can impact the decisions we make, erode trust within teams, and harm Microsoft's reputation.

- **KEEP ACCURATE RECORDS & TRANSACTIONS.** Our records are clear, accurate, and complete. Investors rely on accurate and easily comprehensible information to understand our financial results and where we are headed as a company, and to have confidence in that direction. Keeping accurate records is critical to maintaining investors' trust, making good business decisions, and meeting our regulatory obligations as a public company.
- **COMMUNICATE ACCURATELY TO THE PUBLIC.** Our public statements and communications are honest and not misleading. What we say and how we say it matters. We will win and preserve the trust of our investors and the public only if they know they can rely on what we tell them.
  - <u>How we communicate accurately to the public</u>. We make full, accurate, and timely financial disclosures in reports and documents we submit to the US Securities and Exchange Commission and in other public statements. We listen carefully to feedback and questions from investors and other stakeholders. We do not speak on behalf of the company unless authorized to do so; we direct analyst and media inquiries to Investor Relations or Public Relations. We make sure that any communications about our products and services are honest and accurate. If we endorse our products and services on social media, we make our company affiliation clear and state our honest opinion or belief about the



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

endorsed product or service. Our advertising and promotional material are accurate and free from false claims.

- **SAFEGUARD MICROSOFT'S RESOURCES.** We are responsible stewards of Microsoft's resources. We use company resources and money to do our jobs every day. These resources belong to Microsoft; we owe it to our investors to use them responsibly and in ways that preserve trust and add value.
    - <u>How we safeguard Microsoft's resources</u>. By understanding that business related data is Microsoft's property, and that it may be accessed, preserved, and reviewed in accordance with our policies and applicable laws. By spending Microsoft's funds wisely and guarding against waste and abuse. By using our corporate accounts and services, not personal accounts or services, for business correspondence and data. By exercising good judgment when using company provided technology resources and using them for personal reasons in accordance with company policy and only if it does not interfere with our job responsibilities or harm our work environment.

* * *

- **UPHOLDING OUR TRUST CODE – EMPLOYEES' RESPONSIBILITIES.** Employees are expected to uphold this Trust Code, Microsoft policies, and the law. This means you must:
    - Read, understand, and comply with this Trust Code, and the policies, laws, and regulations that apply to your job.
    - Be truthful and cooperate fully in any internal investigations. Do not conceal or destroy information.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

- Speak up when we see possible violations of the Trust Code, Microsoft policies, and legal and regulatory requirements.
- Complete training on the Trust Code, and attest that you understand and commit to comply with the Trust Code. Failing to read or attest to the Trust Code does not excuse you from these responsibilities.

42. Microsoft's Trust Code further provides that it is "endorsed by and ha[s] the full support of Microsoft's Board of Directors" and applies "to Microsoft, its Board of Directors, and all employees, directors, and executive officers of Microsoft. . . . References to 'employees' include the Board of Directors, employees, directors, and executive officers of Microsoft." Violation of the Trust Code "may result in disciplinary action, up to and including termination of employment."

43. The Audit Committee Charter and Responsibilities Calendar (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of defendants Johnston (Chair), List, Rodriguez, and Stanton (the "Audit Committee Defendants") during the Relevant Period.

44. Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include, among others, the following:

- Annually review and make recommendations as appropriate to the Governance and Nominating Committee about changes to the Audit Committee Charter and Responsibilities Calendar.
- Complete an annual evaluation of the Committee's performance.
- Provide a report in the annual proxy statement that includes the Committee's review and discussion of matters with management and the independent auditor.
- Review policies and procedures with respect to transactions between the Company and officers and directors, or affiliates of officers or directors, and any such transactions that are not a normal part of the Company's



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

business, and review and approve those related-party transactions that would be disclosed pursuant to SEC Regulation S-K, Item 404.

* * *

- On a quarterly basis, review with Finance management, the independent auditor, and the Internal Audit Executive:

  a. Significant findings by the independent auditor and Internal Audit Executive during the year and management's responses.

  b. Any difficulties encountered in the course of the audit work of the independent auditor and internal audit, including any restrictions on the scope of their work or access to required information.

  c. Any changes required in planned scope of the audit plans of the independent auditor and internal audit.

* * *

- Approve the annual internal audit plan.
- Review with Finance management and the independent auditor at the completion of the annual audit: (i) the Company's annual financial statements and related footnotes, and recommend that the audited financial statements be included in the Form 10-K; (ii) the independent auditor's audit of the financial statements and its report thereon, including any matters to be communicated by the independent auditor pursuant to Section 10A of the Securities Exchange Act of 1934; (iii) any significant changes required in the independent auditor's audit plan; (iv) any serious difficulties or disputes with management encountered during the course of the audit and management's response; and (v) other matters related to the conduct of the audit which are to be communicated to the Committee under generally accepted auditing standards.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

- On a quarterly basis, review with Finance management, the independent auditor, and the Internal Audit Executive: (i) the Company's annual assessment of the effectiveness of its internal controls and the independent auditor's attestation; (ii) the adequacy of the Company's internal controls including computerized information system controls and security; (iii) any "material weakness" or "significant deficiency" in the design or operation of internal control over financial reporting, and any steps taken to resolve the issue; and (iv) any related significant findings and recommendations of the independent auditor and internal audit together with management's responses.

* * *

- Review with Finance management and the independent auditor the Company's critical accounting policies and significant changes in the Company's selection or application of accounting principles and the effect of regulatory and accounting initiatives on the financial statements of the Company, and critical audit matters addressed during the audit.
- Participate in a meeting among Finance management, the Internal Audit Executive and the independent auditor before each earnings release to review the earnings release, financial information, use of any non-GAAP information, and earnings guidance.
- Review with Finance management and the independent auditor the Company's quarterly financial statements and analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

- Review with the independent auditor: (i) alternative treatments of financial information within GAAP related to material items that have been discussed with management, ramifications of use of the alternative disclosures and treatments, and the treatment preferred by the independent auditor; (ii) other material written communications between the independent auditor and management (e.g., schedule of unadjusted differences); and (iii) any correspondence with regulators or governmental agencies, and any published reports that raise material issues, concerning the Company's financial statements or accounting policies.
- Review with Finance management, the Internal Audit Executive, and the independent auditor the periodic reports of the Company (including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") and other financial filings with the SEC prior to filing with the SEC.
- After review, recommend to the Board acceptance and inclusion of the annual audited financial statements in the Company's Annual Report on Form 10-K.
- In connection with each periodic report of the Company, review: (i) management's disclosure to the Committee and the independent auditor under Section 302 of the Sarbanes-Oxley Act, including identified changes in internal control over financial reporting; and (ii) the contents of the Chief Executive Officer and the Chief Financial Officer certificates to be filed under Sections 302 and 906 of the Sarbanes-Oxley Act and the process conducted to support the certifications.
- Inquire of management, Chief Compliance Officer or such person's delegate responsible for the legal and policy compliance program (the



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

"Compliance Officer"), the Internal Audit Executive, and the independent auditor about significant risks or exposures, review the Company's policies for enterprise risk assessment and risk management, and except as to those risks for which oversight has been assigned to other committees of the Board or retained by the Board, assess the steps management has taken to control such risk to the Company.

- Review with the Compliance Officer and management the design, organization, and scope of the Company's compliance policies and programs addressing significant business, legal, and regulatory compliance risks not otherwise overseen by the Board or another committee, including government contracting and programs administered by the Company's Compliance and Ethics Office.
- Review with the Compliance Officer and management matters that may present significant business, legal, regulatory, and compliance risks not otherwise overseen by the Board or another committee, including such matters that may have a material impact on the financial statements or internal controls over financial reporting, and related reports received from regulators.
- Develop, review, and oversee procedures for (i) receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters, and (ii) the confidential, anonymous submission of employee concerns regarding accounting or auditing matters.
- Review and make recommendations to the Board regarding the parameters and assumptions underlying the Company's annual operating plan and long-range financial outlook.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

- Review and approve significant capital expenditures and expense commitments. Review return on invested capital and alignment with the Company's strategic objectives.
- Review and approve proposed significant transactions, including mergers, acquisitions, joint ventures, divestitures, and strategic investments. Monitor the execution, financial results, and strategic impact of completed transactions.

45. The Governance and Nominating Committee Charter (the "Governance Charter") imposes additional duties and responsibilities on the members of Governance Committee, which included defendants Peterson (Chair), List, Mason, Scharf, and Thompson (Chair) (the "Governance Committee Defendants") during the Relevant Period. Among the duties imposed by the Governance Charter are:

- <u>Board Evaluation</u>. Annually evaluate and report to the Board on the performance and effectiveness of the Board in fulfilling its responsibilities.
- <u>Identification and Recommendation of Director-Nominees</u>. The Committee shall:

  a. Assist in identifying, interviewing, and recruiting candidates for the Board.

  b. Review and consider shareholder recommended candidates for nomination to the Board.

  c. Annually present to the Board a list of individuals recommended for nomination for election to the Board at the annual shareholders meeting.

  d. Before recommending an incumbent, replacement, or additional director, the Committee will apply the Board Membership Criteria outlined in the Corporate Governance Guidelines.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

- Governance Framework and Guidelines. The Committee shall:

    a. On an ongoing basis, review, develop, and recommend to the Board appropriate changes to the Company's corporate governance framework, including its Articles of Incorporation, Bylaws, Corporate Governance Guidelines, and Director Independence Guidelines.

    b. Monitor compliance with the Corporate Governance Guidelines.

- Committee Composition and Charters. The Committee shall:

    a. Annually review the composition of each committee of the Board (including this Committee) and present recommendations for committee memberships to the Board as needed.

    b. Recommend additional committee members to fill vacancies as needed.

    c. Review annual recommendations of each committee of the Board regarding changes to their charters. At least annually, make recommendations to the Board about changes to the charters of each committee, including this Committee.

- Other Responsibilities. The Committee shall:

    a. Oversee the process and review the results of investigations of any sexual harassment complaints against members of the Board and the Chief Executive Officer. The Committee will report to the full Board on the conclusions of any investigation that results in a founded determination and the disciplinary and other actions taken.

    b. Obtain or perform an annual evaluation of the Committee's performance and make applicable recommendations.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

c. Review and provide guidance to the Board and management about the framework for the Board's oversight of and involvement in shareholder engagement, including shareholder proposals submitted to the Company for consideration at any shareholder meeting and the Company's response to any such proposals.

46. The Compensation Committee Charter (the "Compensation Charter") places additional duties and responsibilities upon the members of the Board's Compensation Committee, which consisted of defendants Rodriguez (Chair), MacGregor, Peterson (Chair), Scharf, Walmsley, and Warrior (the "Compensation Committee Defendants") during the Relevant Period.

47. Pursuant to the Compensation Charter, the overarching duties of the Compensation Committee and its members include, among other things, the following:

- <u>Board Compensation</u>. Periodically review the compensation paid to non-employee directors and make recommendations to the Board for any adjustments. No member of the Committee will act to fix his or her own compensation except for uniform compensation to directors for their services as a director.
- <u>Chief Executive Officer ("CEO") Compensation</u>.

    a. Assist the Board in establishing CEO annual goals and objectives.

    b. Establish the process for annually reviewing the CEO's performance.

    c. Recommend CEO compensation to the independent members of the Board for approval.

        i. In making this recommendation, consider the results of the annual CEO evaluation.

        ii. The CEO may not be present during deliberations or voting concerning the CEO's compensation.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

- Executive Officer Compensation.

  a. In consultation with the CEO, oversee the performance evaluation of the Company's other "executive officers" as defined under Rule 3b-7 under the Securities Exchange Act of 1934 ("Executive Officers") and approve the annual compensation, including salary and incentive compensation targets and awards, for the Executive Officers.

  b. Review and approve compensation arrangements for new Executive Officers and retention and termination arrangements for Executive Officers.

- Other Employee Compensation.

  a. Review (i) annual compensation, including salary and incentive compensation targets and awards, and (ii) compensation arrangements, including retention arrangements for participants in Microsoft's Executive Incentive Plan, other than Executive Officers. The Executive Officers and the other employees covered by this section are referred to herein as the "Senior Officers."

- Development and Succession Planning. Review and discuss with the CEO and report to the Board development and succession plans for Senior Officers, as described under "Development and Succession Planning" in the Microsoft Corporation Corporate Governance Guidelines.

- General Compensation Oversight. Monitor and evaluate matters relating to the compensation and benefits structure of the Company as the Committee deems appropriate, including:

  a. Provide guidance to management on significant issues affecting compensation philosophy or policy.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

b. Provide input to management on whether compensation arrangements for Company executives incentivize unnecessary and excessive risk taking.

c. Review and approve policies regarding CEO and Senior Officer compensation.

d. Review, approve, and administer the Company's executive compensation recovery policy.

- Equity and Retirement Plan Oversight.

a. Administer the Company's equity-based compensation plans to the extent provided under those plans.

b. Appoint and remove plan administrators for the Company's retirement plans as appropriate and perform other duties that the Board may have with respect to the Company's retirement plans.

* * *

- Disclosure. Discuss with management the Company's Compensation Discussion and Analysis ("CD&A") for the annual proxy statement; based on the review and discussion, recommend to the Board that the CD&A be included in the Company's annual report or annual proxy statement; and produce an annual report of the Compensation Committee on executive compensation for the Company's annual proxy statement in compliance with and to the extent required by applicable Securities and Exchange Commission rules and regulations and relevant listing authority.

- Other Responsibilities.

a. Annually review and make recommendations as appropriate to the Governance and Nominating Committee about changes to the charter of the Committee.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

b. Obtain or perform an annual evaluation of the Committee's performance and make applicable recommendations.

c. Annually review the Company's programs for culture and human capital management.

d. Oversee the process and review the results of investigations of any sexual harassment complaints against Senior Officers. The Committee will report to the full Board on the conclusions of any investigation that results in a founded determination and the disciplinary and other actions taken.

## SUBSTANTIVE ALLLEGATIONS

***Background***

48. Microsoft, founded in 1975, was a key player in the early development and spread of personal computing technology, and continues to lead, particularly through its proprietary Windows operating platform.

49. Since then, Microsoft's offerings have expanded to include enterprise software, cloud computing, online services, gaming, and technological hardware, as well as other products and offerings. The Company's cloud computing platform, Azure, has been its main growth driver in recent years. Azure relies on Microsoft's global network of data centers to provide customers with computing, networking, storage, mobile and web application services, AI, "Internet of Things," cognitive services, and machine learning.

50. Azure has generated significant growth for Microsoft, powered by the Company's increasing incorporation of AI capabilities into the platform's suite of available products and services. In FY 2025, revenue attributable to Azure grew to more than $75 billion, a 34% increase year-over-year. This revenue growth drove a corresponding 14% increase in gross margin in the Company's "Intelligent Cloud" reporting segment.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

51. The Company's management has proclaimed the central importance of AI technologies to the Company's business and prospects and touted its development team as being at the forefront of AI development. Specifically, the Individual Defendants consistently represented between May 1, 2025 and January 28, 2026 that the Company's revenue growth would "continue to be driven by Azure."

52. At the same time, the Company has made massive investments in leading developers of LLMs.[3] Microsoft has invested $13 billion in ChatGPT developer OpenAI since 2019 and announced the "next phase" of its historic partnership with OpenAI on October 28, 2025, with OpenAI restructuring as a for-profit public benefit corporation in which Microsoft retained a 27% stake on an as-converted diluted basis (which Microsoft valued at $135 billion). Additionally, OpenAI agreed to purchase $250 billion worth of incremental Azure services. In April 2026, the parties announced revisions to their agreement to, among other things, purportedly add greater clarity and flexibility.

53. Microsoft is also investing billions of dollars in other LLM developers, including OpenAI's competitor, Anthropic, which is the developer of the LLM Claude. On November 18, 2025, Microsoft and Anthropic (together with chip manufacturer NVIDIA Corporation) announced a strategic partnership whereby Microsoft will invest up to $5 billion in Anthropic and partly power its own AI products and services with Claude, while Anthropic committed to purchasing $30 billion of Azure compute capacity and up to one gigawatt of additional capacity from Microsoft.

54. Microsoft's partnerships with LLM developers, in which the parties have committed to substantial reciprocal investments in each other's products and services, have been criticized for their apparent circularity and for creating potential concentration risks due to their size.

[3] LLMs are the computational models that power AI platforms. They are trained on vast amounts of data and designed to mimic natural language processing tasks, such as language generation.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

55. Microsoft's own proprietary generative AI chatbot, Copilot, was first launched in 2023 using ChatGPT's technology. Recently, Microsoft has integrated technology from Claude to power Copilot while also beginning development of its own LLMs.

56. The Company offers Copilot on a "freemium" model, meaning all users can access basic features free of charge but additional "seats" (premium features) are also offered for a fee. Since its initial 2023 launch, Microsoft has released numerous versions of Copilot across many of its consumer and enterprise applications, each with different features and use cases.

57. At all times relevant to the misconduct alleged herein, and continuing to the present day, the Individual Defendants have approved massive reciprocal investments with OpenAI, developed the computing infrastructure on which OpenAI's LLMs operate, and assisted OpenAI in unlawfully misappropriating copyrighted material to train these LLMs. In so doing, the Individual Defendants have abdicated their duties to exercise proper oversight of material risks to the Company and subjected the Company to multiple lawsuits that pose a threat of significant liability for Microsoft. In authorizing and participating in this unlawful conduct, the Individual Defendants have breached their fiduciary duties to exercise candor, good faith, and loyalty in the management and administration of Microsoft's business and affairs.

58. Meanwhile, the Individual Defendants touted the success of Copilot and Microsoft's AI development efforts between May 1, 2025 and January 28, 2026, while simultaneously downplaying concerns about Microsoft's investments in other LLM developers. The Individual Defendants claimed that Copilot offered best-in-class capabilities and enjoyed widespread and growing user adoption and that Microsoft's business dealings with other AI players made the Company well positioned to achieve suitable returns on its AI related investments and emerge as a key benefactor from AI technological advancements. Microsoft stock reached all-time highs of over $550 per share during the Relevant Period, buoyed by the Individual Defendants' statements.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

***The Individual Defendants Breach Their Fiduciary Duties by Participating in Copyright Infringement***

59. The Individual Defendants' approval of massive reciprocal investments with OpenAI, and participation with OpenAI in the unlawful misappropriation of copyrighted material, has subjected the Company to multiple lawsuits that pose a threat of significant liability for Microsoft. In authorizing and participating in this unlawful conduct, the Individual Defendants have breached their fiduciary duties to exercise candor, good faith, and loyalty in the management and administration of Microsoft's business and affairs.

60. In December 2023, Microsoft was named as a defendant in multidistrict litigation by numerous authors against OpenAI, captioned *Authors Guild et al. v. OpenAI Inc. et al.*, C.A. No. 1:23-cv-8292 (S.D.N.Y.) (the "Authors Guild Action"). The plaintiffs in the Authors Guild Action filed a consolidated class action complaint on June 13, 2025, asserting claims against Microsoft for copyright infringement under 17 U.S.C. § 501, vicarious copyright infringement, and contributory infringement (the "Authors Guild Complaint"). The Authors Guild Complaint documents Microsoft's investments in, and substantial participation in the unlawful misappropriation of copyrighted material with, OpenAI.

61. OpenAI and Microsoft have collaborated closely to create and monetize a series of ChatGPT LLMs, which the Authors Guild Complaint asserts represent the "next iteration of generative artificial intelligence models[.]" The models Microsoft has developed with OpenAI have also been used to power Microsoft chatbots, including Bing Chat and Copilot.

62. In collaborating on the development of these LLMs, Microsoft and OpenAI have used what the Authors Guild Complaint describes as "a massive corpus of copyrighted material, including at least hundreds of thousands of books." Rather than license these books from their authors and copyright holders, Microsoft and OpenAI have used pirated libraries to access training data for their LLMs.

63. Although OpenAI has at times been somewhat cryptic about the source of the material it uses to train its GPT models, it has acknowledged that its datasets include "Common Crawl" and



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

the "internet-based books corpora" "Books1" and "Books2."[4] According to an April 20, 2023 article from *The Guardian*, Common Crawl includes text from books copied from pirated sites. OpenAI has admitted that Books1 and Books2 are sourced from the notorious pirate website LibGen. On June 21, 2017, in an action captioned *Elsevier Inc. et al. v. Sci-Hub et al.*, No. 1:15-cv-4282 (S.D.N.Y.), LibGen was permanently enjoined from unlawfully accessing, using, reproducing, and distributing the copyrighted material of the academic publisher Elsevier, and Elsevier was awarded $15 million in statutory damages arising from LibGen's copyright infringement.

64. Microsoft announced the development of Azure in 2020, describing it as "one of the top five publicly disclosed supercomputers in the world" and revealing that it was "[b]uilt in collaboration with and exclusively for OpenAI," and "designed specifically to train that company's AI models."[5] Although the Authors Guild Action primarily faults OpenAI for "the largescale copying" of copyrighted material used to train its LLMs, the Authors Guild Complaint asserts that Microsoft has been "deeply involved in the training, development, and commercialization of OpenAI's GPT products" since at least 2019, and "built and operated" Azure, "the computer system that enabled this unlicensed copying in the first place."

65. As acknowledged in its announcement of Azure, Microsoft purpose-built Azure computing systems for OpenAI to use in training their LLMs. Thereafter, Microsoft was an active participant in the training and development of OpenAI's ChatGPT LLMs and even embedded its own software engineers at the company.

66. With its own employees working on understanding the training process and training dataset used for ChatGPT, Microsoft would have known that OpenAI's training data was scraped indiscriminately from the internet and included a massive quantity of pirated and copyrighted material, including a trove of copyrighted books.

---

[4] Tom B. Brown *et al.*, *Language Models Are Few-Shot Learners* 8 (2020), available at https://arxiv.org/pdf/ 2005.14165.pdf (last accessed Aug. 27, 2026).

[5] Jennifer Langston, *Microsoft announces new supercomputer, lays out vision for future AI work*, Microsoft (May 19, 2020), available at https://news.microsoft.com/source/features/ai/openai-azure-supercomputer/ (last accessed Aug. 27, 2026).



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

67. Through its creation and maintenance of the Azure supercomputer that powers OpenAI's GPT models, Microsoft directly made unlicensed copies and provided critical assistance to OpenAI in making unlicensed copies of copyrighted material for the purpose of training the GPT models.

68. Rather than back away from the partnership with OpenAI after learning about its misappropriation of copyrighted material, the Individual Defendants committed the Company to further investments in OpenAI. After an initial investment of $1 billion in 2019, Microsoft invested $2 billion in OpenAI in 2021 and $10 billion in 2023. These investments provided added motivation for the Individual Defendants to participate in OpenAI's wrongful conduct, as success for OpenAI meant a greater return on Microsoft's investments.

69. The Company also has added motivation to participate in this conduct because its own chatbots incorporate OpenAI's GPT LLM models. When Copilot first launched in 2023, Microsoft ran it entirely on GPT technology. Additionally, the Company has integrated GPT technology into a chatbot feature embedded in its search engine, Bing, called Bing Chat. Since integrating that technology, Bing surpassed 100 million daily active users for the first time in its history.

70. Microsoft announced via its website on January 21, 2025 that it had committed to extending its "strategic partnership with OpenAI" through 2030. Defendant Nadella has made clear how much he values the partnership with OpenAI in numerous public statements, specifically stating in a *New York Magazine* interview on November 21, 2023:

> We have all the IP rights and all the capability. If OpenAI disappeared tomorrow, I don't want any customer of ours to be worried about it quite honestly, because we have all of the rights to continue the innovation. Not just to serve the product, but we can go and just do what we were doing in partnership ourselves. We have the people, we have the compute, we have the data, we have everything.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

71. Microsoft has now been sued in several additional copyright infringement actions. On April 3, 2025, the United States Panel on Multidistrict Litigation consolidated twelve actions pending in the United States District Court for the Southern District of New York and the United States District Court for the Northern District of California, including the Authors Guild Action, for centralized pretrial proceedings. According to the United States Panel on Multidistrict Litigation's Transfer Order, each of these twelve actions (the "Copyright Actions") arise "from allegations that OpenAI and Microsoft used copyrighted works, without consent or compensation, to train their" LLMs. The consolidated actions are now pending under the caption *In re OpenAI, Inc. Copyright Infringement Litigation*, C.A. No. 1:25-md-3143 (S.D.N.Y.).

72. The Individual Defendants continue to maintain their partnership with OpenAI, despite the fact that this partnership has subjected the Company to a massive liability threat arising out of the Copyright Actions. The Individual Defendants have approved, and continue to authorize, massive reciprocal investments with OpenAI, developed the computing infrastructure on which OpenAI's LLMs operate, and assisted OpenAI in unlawfully misappropriating copyrighted material to train these LLMs. In so doing, the Individual Defendants have abdicated their duties to exercise proper oversight of material risks to the Company and subjected the Company to multiple lawsuits that pose a threat of significant liability for Microsoft. In authorizing and participating in this unlawful conduct, the Individual Defendants have breached their fiduciary duties to exercise candor, good faith, and loyalty in the management and administration of Microsoft's business and affairs.

***The Individual Defendants Breach Their Fiduciary Duties by Making and Authorizing False and Misleading Statements***

73. While they were breaching their fiduciary duties with respect to Microsoft's partnership with OpenAI, the Individual Defendants further breached their fiduciary duties by making or authorizing materially false and misleading statements and failing to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, among other things, that: (i) Copilot was experiencing significant problems with brand positioning, user experience, usage, data siloing, computational capacity,



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

organizational, and interoperability; (ii) Copilot was not a market leader, but in fact was substantially behind its competitors as measured by numerous benchmark tests; (iii) Microsoft had failed to convert a significant percentage of its commercial Microsoft 365 users to paid Copilot subscriptions and Copilot was increasingly losing market share to rival products; and (iv) because of Copilot's inferior competitive positioning, Microsoft was diverting billions in capital expenditures and CPU and GPU capacity towards Copilot and AI-related research and development and away from fulfilling demand for its profitable Azure services.

74. These misstatements began on April 30, 2025. That day, Microsoft announced its results for the third quarter of FY 2025 ("3Q 2025") after the market had closed. In a press release, Microsoft stated it had generated $26.8 billion in Intelligent Cloud revenue in 3Q 2025, a 21% increase, "driven by Azure and other cloud services revenue growth of 33%." The press release quoted defendant Nadella as stating: "'Cloud and AI are the essential inputs for every business to expand output, reduce costs, and accelerate growth. . . . From AI infra and platforms to apps, we are innovating across the stack to deliver for our customers.'"

75. Also on April 30, 2025, Microsoft filed its 3Q 2025 quarterly report with the SEC on Form 10-Q, which repeated the financial information regarding Azure and Intelligent Cloud contained in the 3Q 2025 release. The Form 10-Q further stated: "Azure and other cloud services revenue grew 33% driven by demand for our portfolio of services, including 16 points from our AI services."

76. That same day, Microsoft hosted an earnings call with analysts and investors to discuss the Company's 3Q 2025 results. In his prepared remarks, defendant Nadella represented that Microsoft "continue[s] to win new customers with best-in-class AI capabilities." In particular, Nadella highlighted purported advancements in Copilot and its growing adoption by consumers and businesses alike, stating:

> Microsoft 365 Copilot is built to facilitate human agent collaboration, hundreds of thousands of customers across geographies and industries now use Copilot, up 3 times year-over-year. Our overall deal size continues to grow. In this



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

> quarter, we saw a record number of customers returning to buy more seats. And we're going further. Just last week, we announced a major update, bringing together agents, notebooks, search and create into a new scaffolding for work.
>
> Our new researcher and analyst deep reasoning agents analyze vast amounts of web and enterprise data to deliver highly skilled expertise on demand directly within Copilot. Beyond horizontal knowledge work, we are introducing agents for every role and business process.
>
> Our sales agent turns contacts into qualified leads and with sales chat reps can quickly get up to speed on new accounts. [A]nd our customer service agent is deflecting customer inquiries and helping service reps resolve issues faster. With Copilot Studio, customers can extend Copilot and build their own agents with no code, low code.
>
> More than 230,000 organizations, including 90% of the Fortune 500 have already used Copilot Studio. With deep reasoning and agent flows in Copilot Studio, customers can build agents that perform more complex staff and also handle deterministic scenarios like document processing and financial approvals.
>
> And they can now build computer use agents that take action on the UI across desktop and web apps. And with just a click, they can turn any SharePoint site into an agent, too. This quarter alone, customers created over 1 million custom agents across SharePoint and Copilot Studio, up 130% quarter-over-quarter.

77. Defendant Hood also gave prepared remarks on the 3Q 2025 earnings call, claiming that Microsoft "continue[s] to see strong demand for our cloud and AI offerings as they help customers drive productivity, increase efficiencies and grow their businesses." Hood highlighted the



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

purported success of Copilot, stating: "ARPU growth was again driven by E5 and M365 Copilot." She continued:

> With M365 Copilot, we continue to see growth across customer segments and geos. Paid M365 Commercial seats grew 7% year-over-year to over $430 million. While we continue to see installed base expansion across all customer segments, growth was primarily driven by our small and medium business and frontline worker offerings.

78. On July 30, 2025, Microsoft announced its financial results for the fourth quarter of FY 2025 ("4Q 2025") and full FY 2025 in a press release. The 4Q 2025 press release stated that the Company had generated $29.9 billion in Intelligent Cloud revenue that quarter, a 26% increase, "driven by Azure and other cloud services revenue growth of 39%."

79. Defendant Nadella was quoted in the 4Q 2025 press release as stating: "'Cloud and AI is the driving force of business transformation across every industry and sector. . . . We're innovating across the tech stack to help customers adapt and grow in this new era, and this year, Azure surpassed $75 billion in revenue, up 34 percent, driven by growth across all workloads.'"

80. That same day, Microsoft filed its annual report for FY 2025 on Form 10-K with the SEC. The Form 10-K repeated the financial information regarding Azure and Intelligent Cloud contained in the 4Q 2025 press release and further stated that "Azure and other cloud services revenue grew 34% driven by demand for our portfolio of services."

81. Also on July 30, 2025, Microsoft hosted an earnings call with analysts and investors to discuss the Company's FY 2025 results. Defendant Nadella again gave prepared remarks, in which he claimed Microsoft was experiencing "record" enthusiasm for its Copilot products:

> Talking about the app layer, these applications are becoming embedded in our daily work and life. Our family of Copilot apps has surpassed 100 million monthly active users across commercial and consumer. And when you take a



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

> broader look at the engagement of AI features across our products, we have over 800 million monthly active users.
>
> Microsoft 365 Copilot is becoming the new way to organize work and workflow and work artifacts. We rolled out our biggest update to Microsoft 365 Copilot to date this quarter, bringing together chat, search, create, notebooks as well as agents into one intuitive scaffolding. With this innovation and continued product improvements, we are seeing real momentum. Customers continue to adopt Copilot at a faster rate than any other new Microsoft 365 suite, with strong usage intensity as shown by our week-over-week retention. And we saw the largest quarter of seat ads since launch with a record number of customers returning to buy more seats.

82. Then, September 10, 2025, defendant Spataro spoke at the Goldman Sachs Communacopia & Technology Conference. During his presentation, Spataro said, "we feel great about what we can do" through Copilot to "improve efficiency by 20% to 30%." He gave several examples of purported real-world efficiency gains, characterizing them as "just real nuts and bolts." Spataro continued: "It may not be the most exciting thing to talk about, but at Microsoft, we're saving a lot of money, and we see our customers doing it as well."

83. In response to a question at the September 10, 2025 conference about how Copilot was doing in the market, defendant Spataro claimed that "70% of the Fortune 500 are using Copilot in a pretty extensive way, and those are lands, and we're expanding from there." He further claimed: "This past quarter, when we reported, it was our best quarter ever both in terms of seat adds for Copilot and the number of customers."

84. Defendant Spataro was also asked during the September 10, 2025 conference how "Copilot usage tracked relative to your expectations[.]" In response, he said Copilot "still is our fastest-growing M365 portfolio product that we've ever had. And that's saying something because [other Microsoft products] are big important products that continue to really grow."



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

85. On October 29, 2025, Microsoft announced its earnings for the first quarter of fiscal year 2026 ("1Q 2026") in a press release. The press release stated that Microsoft generated $30.9 billion in Intelligent Cloud revenue in 1Q 2026, a 28% increase, while "Azure and other cloud services revenue increased 40%." Defendant Nadella was quoted as stating: "'Our planet-scale cloud and AI factory, together with Copilots across high value domains, is driving broad diffusion and real-world impact. . . . It's why we continue to increase our investments in AI across both capital and talent to meet the massive opportunity ahead.'"

86. Defendant Hood was also quoted in the 1Q 2026 press release, stating: "'We delivered a strong start to the fiscal year, exceeding expectations across revenue, operating income, and earnings per share. . . . Continued strength in the Microsoft Cloud reflects the growing customer demand for our differentiated platform.'"

87. The same day, Microsoft filed its quarterly report for 1Q 2026 on Form 10-Q with the SEC. The 1Q 2026 Form 10-Q repeated the financial information regarding Azure and Intelligent Cloud contained in the press release, but further stated: "Azure and other cloud services revenue grew 40% driven by demand for our portfolio of services with continued growth across all workloads."

88. That same day, Microsoft hosted an earnings call with analysts and investors to discuss the Company's 1Q 2026 results. Defendant Nadella touted the recently announced restructuring of Microsoft's partnership with OpenAI and the Company's purportedly market-leading AI capabilities:

> And as you saw yesterday, we closed a new definitive agreement with OpenAI, marking the next chapter in what is one of the most successful partnerships and investments our industry has ever seen. This is a great milestone for both companies, and we continue to benefit mutually from each other's growth across multiple dimensions.
>
> Already, we have roughly 10x-ed our investment. OpenAI has contracted an incremental $250 billion of Azure services, our rev share, exclusive IP rights and API exclusivity for Azure continue until AGI or through 2030. And we



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

> have extended the model and product IP rights through 2032. And we are also energized to innovate and pursue AI advancements with both talent and compute investments that have real-world impact.
>
> With that, let's turn to our momentum across our AI platform and Copilots as well as with agents. We have the most expansive data center fleet for the AI era, and we are adding capacity at an unprecedented scale. We will increase our total AI capacity by over 80% this year and roughly double our total data center footprint over the next two years, reflecting the demand signals we see. Just this quarter, we announced the world's most powerful AI data center, Fairwater in Wisconsin, which will go online next year and scale to 2 gigawatts alone.
>
> And we have deployed the world's first large-scale cluster of NVIDIA GB300s. We are building a fungible fleet that's been continuously modernized and spans all stages of the AI life cycle from pretraining to post training to synthetic data generation and inference. And it also goes beyond GenAI workloads to recommendation engines, databases, and streaming. We're optimizing this fleet across silicon systems and software to maximize performance and efficiency.

89. Defendant Nadella elaborated on the purported demand and capabilities of Copilot, calling Copilot "best-in-class" according to multiple third-party benchmarks:

> We are seeing increasing demand and diffusion of our AI platform and family of Copilots, which is fueling our investments across both capital and talent.
>
> * * *
>
> Now let's turn to applications and agents we ourselves are building on this platform. We now have 900 million monthly active users of our AI features across our products. And our first-party family of Copilots now has surpassed



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

150 million monthly active users across the information work, coding, security, science, health, and consumer.

When it comes to information work, we continue to innovate with Microsoft 365 Copilot. Copilot is becoming the UI for the agentic AI experience. We have integrated chat and agentic workflows into everyday tools like Outlook, Word, Excel, PowerPoint, and Teams. Just nine months since release, tens of millions of users across Microsoft 365 customer base are already using chat. Adoption is accelerating rapidly, growing 50% quarter over quarter, and we continue to see usage intensity increase.

This quarter, we also introduced agent mode, which turns single prompts into export quality Word documents, Excel spreadsheets, PowerPoint presentation and then iterate to deliver the final product much like agent mode in coding tools today. We're thrilled by the early response, including third-party benchmarks that rank it best-in-class.

Beyond individual productivity, Copilot is multiplayer, (technical difficulty) agents like Facilitator and Project Manager, prep meeting agendas, take notes, capture decision, kick off group tasks.

We are seeing a growing Copilot agent ecosystem with top ISVs like Adobe, Asana, Jira, LexisNexis, SAP, ServiceNow, Snowflake and Workday, all building their own agents that connect to Copilot. And customers are also building agents for their mission-critical business processes and workflows using tools like Copilot Studio and integrating them into Copilot.

The overall number of agent users doubled quarter over quarter. And just yesterday, we announced App Builder, a new Copilot agent that lets anyone create and deploy task-specific apps and agents in minutes grounded in Microsoft 365 context.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

> All this innovation is driving our momentum. Customers continue to adopt Microsoft 365 Copilot at a faster rate than any other new Microsoft 365 suite, all up more than 90% of the Fortune 500 now use Microsoft 365 Copilot, Accenture, Bristol-Myers Squibb, EY Global and the UK's Tax and Payments and Customs Authority all purchased over 15,000 seats this quarter. Lloyds Banking Group has deployed 30,000 seats, saving each employee an average of 46 minutes daily.
>
> And a large majority of our enterprise customers continue to come back to purchase more seats. Our partner, PwC, alone added 155,000 seats this quarter and now has over 200,000 deployed across its global operations. In just six months, PwC employees interacted with Microsoft 365 Copilot over 30 million times, and they credit this identic transformation with saving millions of hours in employee productivity.

90. Then, defendant Jha spoke at the UBS Global Technology and AI Conference on December 2, 2025. In response to a question about consumer adoption of Copilot, Jha claimed that the "intensity" of Copilot usage was increasing:

> As we recently disclosed, two quarters in a row, the daily active engagement with Copilot has more than doubled, quarter over quarter. That, to me, is a real sign of product with increased intensity of usage and more users engaging with the Copilot experience.
>
> Another one I would point to: Maybe a couple of quarters ago, we said, what, 70% of the Fortune 500 had Copilot. Now, that's up to 90%.
>
> I do think the ARPU growth is a good one to think about. As we discussed, most of our seat growth today is in lower ARPU base: small businesses, first-line workers. The fact that our ARPU growth has been stable, Copilot is a contributor to that.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

91. Defendant Jha also fielded a question about Copilot's trajectory, claiming that there were several "things that are already elevating the capabilities of Copilot":

> I think the first is the reasoning model finally unlocks AI and graphical user interfaces to work much more effectively. I'm very excited in the January, February timeframe. You're going to see agent mode inside of Office, inside of Excel, inside of Word, inside of PowerPoint, in your calendar, in your meeting, inside your Teams channel. That is going to be a big one.
>
> It's one thing to go and say there's AI off on the side, which I think is a very interesting user experience because you get to express your intent in a natural language, but then, to be able to take that same capability and bring that to existing workflows that hundreds of millions of people are already on with a graphical user interface and have those two coexist, I think the agent mode is going to be a big unlock. That's thing 1.
>
> The second thing is what we talked about: enabling more Agentic workflows. This is where Agent 365 as a governance and a compliance plane enables customers to go without the worry of a sprawl or a management issue on their hands. Finally, with Copilot, we brought multiple sources of intelligence into Copilot. Just like if I hire an employee with liberal arts background to work on a project and I hire an employee with a STEM background to work on a project, they're going to bring different strengths. And so with Copilot, it's not just about the model. It's about how the models come together with the graphical user interface, the innate capabilities of the model, multiple lineages of the model to actually deliver the outcome or the workflow that you're planning to go do, whether in our applications or agents that you will build on your own.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

92. In response to a question at the December 2, 2025 conference about Copilot's competition, specifically Google's Gemini, defendant Jha said:

> Let me first just say, look, with – let me talk about Copilot, what's differentiated, what's unique?
>
> The first thing we got to do is to make sure we meet users' expectations with what they expect Generative AI to do: be a great writer, be a great analyzer, be able to tell you the weather, create an image, and all of that stuff.
>
> That's [table stakes]. We're going to go do that. We're going to be competitive like any other Gen AI tool on that.
>
> Now, let's talk about what's unique and what's differentiated.
>
> The first thing is what we call Work IQ, which is understanding your work context. Most of the people powering economic activity around the globe are on M365. Work IQ gives us a pretty good understanding of the projects that matter to you, who your work group is, what events are interesting, who are your customers, your e-mails, your meetings, your documents. We have a pretty good understanding of that stuff.
>
> Then, you'll hear the other tools talk about connectors. Connector is trying to drink through a very thin straw and understand your work context. Now, you can take many sips from a thin straw, it is still a thin straw.
>
> And so we have customers who've done side-by-side analysis of Copilot in the context of your work and connector-based things and the gap is very significant and growing. Anyway, that's just thing one.
>
> Thing two, though, as people use Copilot, both as a new endpoint, as a peer to what Excel, PowerPoint, Outlook, Teams – as a pure endpoint. But they have billions of transactions every hour that go through these applications.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

> We have an opportunity to serve the same Work IQ intelligence with agent mode inside of these existing applications that people use. We can uniquely do that well. That's thing two.
>
> Thing three, human-to-human collaboration, communication, productivity, highly regulated. We have 15 years' experience on how to do eDiscovery, sensitivity label, all sorts of things, legal hold, data classification, data governance.
>
> All of that works with human-to-AI conversations in Copilot automatically for customers. Our 15 years of maturity on that stuff is enterprise-grade maturity and human-to-human productivity. Human and AI productivity gets all of that for free. The other providers are going to have to go build all of that capability.
>
> Thing 4, can I keep going or you can keep coming?
>
> Thing 4, though, it's, like, can I go back to – we are not beholden to a model, we are beholden to the best outcome. And so we will build experiences that are powered by whether it be our IP partner, OpenAI, whether it be Anthropic, whether it be Copilot tuning, whether it be an open source model whose weights you want to go create as your own unique IP. We are multi-model.
>
> Finally, the more important thing that – and I go back to the comment I made earlier, if you think that the future workforce is going to have more agents than humans – (inaudible) this is going to be true in every organization, how is the human supposed to get work?
>
> I thought that the beauty of AI was I don't have to worry about tools anymore. I have one natural language interface that abstracts away the tools and I express my intent.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

> In a world where, now, I'm surrounded by hundreds of agents that are semi autonomous, some that I'm managing, some that I have to rendezvous with, how does a human navigate all of that stuff?
>
> Copilot is going to be the UI through which they orchestrate the agent. We are going to be the search engine for these agents. We're going to be the relevance engine for these agents. We're going to be the orchestration engine for these agents.
>
> IT is going to have a bunch of controls. Karl, you're in this department. These following agents are the most relevant to you. Your work group will create an agent that you tend to use a lot. Copilot will know to use that.
>
> So when you put all of these things together, I really like our ability to go serve M365 customers with M365 Copilot.

93. Microsoft held its Annual Shareholders Meeting on December 5, 2025. During the meeting, defendant Nadella highlighted the purported "major advances in AI innovation" that had occurred in Microsoft's "family of Copilots[,]" while defendant Hood emphasized Microsoft Windows' purported "best in class AI capabilities." Microsoft 365 Copilot Director Callie August claimed that "Copilot doesn't just access your work data, it actually understands it." She continued: "We call this work IQ, and it's the intelligence layer behind Microsoft 365 Copilot and agents that helps Copilot understand you, your job, and your company. This enables Copilot to give you more accurate, relevant, and personalized responses."

94. Later on in the shareholder meeting, defendant Nadella discussed the AI-readiness of the Company's cloud infrastructure, stating it was already "obviously at scale and building out rapidly":

> So for example, our infrastructure business, one of the great opportunities we now get is to build out our cloud infrastructure so that it's AI ready for what is going to be the token factories or the intelligence factories. So that's sort of



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

> our number one priority. We're obviously at scale and building out rapidly. The layer above that. Is you want to use these token factories to create AI agents, so there's a new app server being born, and that's where things like Foundry and GitHub Copilot and all come together so that we can then enable our developers and you know our partners to build great agents.
>
> And then the layer above that is where the high value domains in which we, have always participated, information work, right? That's where Microsoft 365 Copilot comes in. Software development with Gitup Copilot or security Copilot or what we're doing in business applications and of course in the consumer space, so we're taking a pretty full stack approach, but the real goal is for not only for us to reimagine the current categories and also build new extensions.

95. The statements detailed in the foregoing paragraphs ¶¶74-94 were materially false and/or misleading when made and failed to disclose material adverse facts about Microsoft's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, among other things, that: (i) Copilot was experiencing significant problems with brand positioning, user experience, usage, data siloing, computational capacity, organizational, and interoperability; (ii) Copilot was not a market leader, but in fact was substantially behind its competitors as measured by numerous benchmark tests; (iii) Microsoft had failed to convert a significant percentage of its commercial Microsoft 365 users to paid Copilot subscriptions and Copilot was increasingly losing market share to rival products; and (iv) because of Copilot's inferior competitive positioning, Microsoft was diverting billions in capital expenditures and CPU and GPU capacity towards Copilot and AI-related research and development and away from fulfilling demand for its profitable Azure services.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

96. As a result, the Individual Defendants' positive statements between May 1, 2025 and January 28, 2026 about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

***The Company Issues a False and Misleading Proxy Statement***

97. On October 21, 2025, Microsoft filed a Schedule 14A with the SEC (the "2025 Proxy Statement"), soliciting proxies to vote at the annual stockholder meeting on December 5, 2025. The 2025 Proxy Statement contained material misstatements and omissions.

98. The 2025 Proxy Statement asked Microsoft stockholders to vote to, among other things: (1) reelect defendants Hoffman, Johnston, List, MacGregor, Mason, Nadella, Peterson, Pritzker, Scharf, Stanton, and Walmsley, as well as elect Rainey for the first time, to the Board for one year terms ending as of the Company's annual meeting of stockholders in 2026; (2) ratify the appointment of Deloitte & Touche LLP as Microsoft's independent auditor for the fiscal year ending June 30, 2026; and (3) approve Microsoft's 2026 Stock Plan, which provided for a maximum of 226,000,000 shares of Microsoft stock to be issued as compensation to Microsoft's employees, non-employee directors, and consultants.

99. Regarding the Board's role in risk oversight, the 2025 Proxy Statement stated:

> Effective risk management is critical to Microsoft's ability to achieve its mission. The Board exercises direct oversight of strategic risks to the Company and other risk areas not delegated to one of the Board's committees. Our Board looks to the expertise of its committees to provide strategic oversight in their areas of focus. The committees are charged with specific areas of risk oversight and regularly report back to the full Board.
>
> * * *
>
> The Board maintains direct oversight over AI strategy risk. Our Environmental, Social, and Public Policy Committee assists the Board in overseeing Microsoft's AI governance and regulation risk and provides



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

oversight and guidance on Microsoft's responsible AI policies and programs. The Committee receives and provides feedback on regular updates from management regarding Microsoft's ability to design, build, use, and access AI in a way that is responsible and meets customer expectations and regulatory requirements.

100. Regarding the Audit Committee, the 2025 Proxy Statement stated:

[The Audit Committee] [o]versees the Company's processes to manage risk; the Company's financial statements; compliance with legal and regulatory requirements and corporate policies and controls, including controls over financial reporting, computerized information systems and security; and the independent auditor and internal audit function.

* * *

The Audit Committee is responsible for the compensation, retention, and oversight of the independent auditor engaged to issue audit reports on our consolidated financial statements and internal control over financial reporting. The Audit Committee relies on the expertise and knowledge of management, the internal auditor, and the independent auditor in carrying out its oversight responsibilities.

The Board has determined that each Audit Committee member has sufficient knowledge in financial and auditing matters to serve on the Audit Committee. All current members of the Audit Committee meet the Nasdaq listing standard of financial sophistication and three are "audit committee financial experts" under Securities and Exchange Commission ("SEC") rules.

As provided in our Corporate Governance Guidelines, members of the Audit Committee ordinarily may not serve on over three public company audit committees (including Microsoft's). In calculating service on a public



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

> company board or audit committee, service on a board or audit committee of a parent and its substantially-owned subsidiary counts as service on a single board or audit committee. Any Audit Committee member's service on over three public company audit committees will be subject to the Board's determination that the member is able to effectively serve on the Company's Audit Committee. The Governance and Nominating Committee and the Board considered Ms. List's service on four public company audit committees, including her professional qualifications, former experience as a public company chief financial officer, the fact she is retired from active employment, and the nature of and time involved in her service on other boards. Following such review, the Board determined that Ms. List is able to effectively continue to serve on the Company's Audit Committee.

101. The 2025 Proxy Statement detailed a proposal that the National Legal and Policy Center intended to submit at the Company's annual meeting for Microsoft to:

> prepare a report . . . which assesses the risks to the Company's operations and finances, and to public welfare, presented by the real or potential unethical or improper usage of external data in the development and training of its artificial intelligence offerings; what steps the Company takes to mitigate those risks; and how it measures the effectiveness of such efforts.

102. The National Legal and Policy Center's proposal (the "Report on AI Data Usage Oversight Proposal") specifically highlighted concerns about "Microsoft's record on data ethics[,]" including:

- Microsoft employs generative AI models developed by OpenAI, which allegedly stole large amounts of personal information by scraping the web, including "private information and private conversations, medical data, information about children – essentially every piece of data exchanged on



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

the internet it could take – without notice to the owners or users of such data, much less with anyone's permission."

- Paul Nakasone, former director of National Security Agency – which has been criticized for spying on American citizens – sits on OpenAI's board.
- Microsoft received pushback against its proposed AI "Recall" feature, which screenshots everything a Windows and Copilot user sees or does and turns it into searchable data. The feature was delayed due to the resistance, but then was eventually released.
- Microsoft or OpenAI, through their services, may inadvertently or deliberately access and utilize proprietary information provided by users.
- Microsoft and OpenAI have been sued by *The New York Times*, among others, which alleged copyright infringement.

103. The Report on AI Data Usage Oversight Proposal continued:

> Microsoft is now developing its own models to better compete, including against OpenAI. The Company has been light on disclosures regarding what user data may be retained by itself or its partners for training purposes. Further, the Company has no publicly available metrics to measure the success of its AI data ethics efforts.
>
> Prioritizing data ethics in Microsoft's AI development may reduce regulatory risk and provide a competitive advantage with consumers. Microsoft's position in the AI arms race, and its associated historic valuation, hang in the balance.

104. The Board recommended that Microsoft stockholders vote against the Report on AI Data Usage Oversight Proposal, opining that it was "unnecessary and largely covered by existing requirements set forth by the European Union Artificial Intelligence Act." The 2025 Proxy Statement claimed Microsoft used "a variety of data sources, including publicly available information, in a



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

manner consistent with global copyright laws" and specifically said the Company did "not source information that is behind a paywall, subject to a login or subscription, includes content that violates our policies, or is from a domain that has signaled a preference to opt-out of training AI models using a tag such as NO ARCHIVE." The 2025 Proxy Statement represented that "Microsoft sources the following categories of data for training generative AI models responsibly":

> - **Publicly available data:** We train on select publicly available data, mostly collected from industry-standard machine learning datasets and web crawls, using practices similar to those used by search engines. We exclude sources with paywalls, sources that contain content that violates our policies, and sources that have opted-out of training using web controls that we published. On top of this, we do not train on data from domains listed in the Office of the United States Trade Representative Notorious Markets for Counterfeiting and Piracy list.
> - **Acquired data:** We train on data that we gain access to (such as archives and metadata) through negotiated arrangements with publishers and copyright owners.
> - **First party data:** We train on data from select Microsoft consumer (but not enterprise) services in accordance with our user policies and protections and with clear notice to users. For example, Bing search queries are used to improve AI models that are used to return relevant search results.
> - **Synthetic data:** We sometimes train on synthetic datasets. These we create by prompting large language models to generate specific requested output before reviewing and filtering the results to ensure they are of sufficient quality to be part of the training dataset.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

- **Human feedback:** We include human feedback from AI trainers, red teamers, and employees in our training process. This includes, for example, human feedback that reinforces a quality output to a user's prompt, improving the end user experience.

105. With respect to the Company's involvement with OpenAI, the 2025 Proxy Statement said:

> **OpenAI is a Separate Organization that Manages its Own Data Sourcing Practices**
>
> The proposal focuses specifically on linking Microsoft's data sourcing practices to OpenAI. We partner with a wide variety of companies that complement our AI skills and approach to move the industry forward, help customers, and provide access to the latest technologies through our platform, including OpenAI. OpenAI explained its own data sourcing practices and current work to further enhance those practices in a blog post published on May 7, 2024 (see openai.com/index/approach-to-data-and-ai/).

106. The above statements conveyed that the Board and its committees maintained sufficient compliance, internal controls, risk controls, review, and reporting programs to identify and address deficiencies in the Company's financial reporting, yet was unaware of existing material risks that could and would affect the Company. The above statements also gave assurances that the Company's independent auditor was being properly overseen and audit disclosures were accurate.

107. The 2025 Proxy Statement was materially misleading because it failed to disclose that: (i) although Microsoft claimed its officers and directors adhered to the Trust Code, the Individual Defendants were actively violating the Trust Code; (ii) contrary to the 2025 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Microsoft to issue false and misleading statements; and (iii) the Individual Defendants used "pay-for-performance" rewards when



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

calculating executive compensation despite artificially inflating the share price of Microsoft stock by issuing false and misleading statements.

108. The 2025 Proxy Statement was also materially misleading because it represented that the Company had adequate internal controls in place to manage copyright-related risks arising from its AI deals with other companies, including OpenAI. The 2025 Proxy Statement made clear that the Board had direct oversight responsibility for AI strategy risk, and falsely assured investors that the Company used data sources "in a manner consistent with global copyright laws" and was not participating in the unlawful misappropriation of copyrighted material.

109. The 2025 Proxy Statement was also materially misleading because it failed to disclose to investors, among other things, that: (i) Copilot was experiencing significant problems with brand positioning, user experience, usage, data siloing, computational capacity, organizational, and interoperability; (ii) Copilot was not a market leader, but in fact was substantially behind its competitors as measured by numerous benchmark tests; (iii) Microsoft had failed to convert a significant percentage of its commercial Microsoft 365 users to paid Copilot subscriptions and Copilot was increasingly losing market share to rival products; and (iv) because of Copilot's inferior competitive positioning, Microsoft was diverting billions in capital expenditures and CPU and GPU capacity towards Copilot and AI-related research and development and away from fulfilling demand for its profitable Azure services.

***Microsoft Repurchases Shares Between May 1, 2025 and January 28, 2026***

110. Between May 1, 2025 and January 28, 2026, while they were inflating the Company's stock price through their materially false and/or misleading statements, the Individual Defendants caused the Company to repurchase its common stock at artificially inflated prices. In total, between May 1, 2025 and January 28, 2026, the Company spent approximately $14.5 billion to repurchase nearly 30 million shares at artificially inflated prices. The actual value of the Company's stock was $433.50 per share, as of closing on January 28, 2026. Therefore, Microsoft should have spent no



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

more than $12,855,196,272 on these share repurchases. As a result of the overpayment, Microsoft suffered damages of at least $1,662,434,503.

111. The following chart details the Company's repurchase transactions between May 1, 2025 and January 28, 2026:

| DATE (MM/YY) | SHARES REPURCHASED | SPENT[6] |
|---|---|---|
| 05/25 | 2,360,700 | $1,057,617,207 |
| 06/25 | 1,979,017 | $943,555,725 |
| 07/25 | 2,123,765 | $1,075,474,596 |
| 08/25 | 2,613,910 | $1,351,757,417 |
| 09/25 | 3,011,828 | $1,527,870,226 |
| 10/25 | 3,523,401 | $1,835,339,581 |
| 11/25 | 2,903,047 | $1,441,972,475 |
| 12/25 | 5,558,939 | $2,686,690,808 |
| 01/26[7] | 5,579,825 | $2,597,352,739 |
| **TOTAL** | **29,654,432** | **$14,517,630,775** |

***Investors Learn the Truth About Defendants' Misstatements***

112. The truth concerning the Individual Defendants' materially false and/or misleading statements was revealed beginning on January 28, 2026, when Microsoft announced disappointing results for the second quarter of fiscal year 2026 ("2Q 2026"). Specifically, the Company revealed that during 2Q 2026, Azure's growth had slowed suddenly and fallen below analyst expectations, while Microsoft's capital expenditures had skyrocketed.

---

[6] Calculated based on the average price paid per share, as disclosed in Microsoft's Forms 10-Q and 10-K filed between May 1, 2025 and January 28, 2026.

[7] The relevant truth was revealed on January 28, 2026. Microsoft does not disclose the exact dates upon which it makes share repurchases.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

113. On the Company's earnings call for 2Q 2026, defendant Hood revealed that the slower Azure growth was primarily due to computational capacity constraints, as the Company had diverted CPU and GPU capacity to Copilot applications and AI-related research and development. Microsoft also revealed that it had increased capital expenditures to $37.5 billion during 2Q 2026, and spent $72.4 billion in total in the first half of the fiscal year, largely to support its increased Copilot and AI-related research and development costs. For reference, the Company had spent just $88.2 billion for the entirety of FY 2025. Additionally, Microsoft revealed for the first time that despite having more than 450 million commercial Microsoft 365 users, it only had 15 million paid Microsoft 365 Copilot seats to date, which fell materially below analyst estimates.

114. Following these revelations, the price of Microsoft shares declined from $481.63 per share at market close on January 28, 2026 to $433.50 per share at market close on January 29, 2026, on abnormally high trading volume.

***The Fallout Continues***

115. A few days later, on February 3, 2026, *The Wall Street Journal* released an article that documented severe challenges and functionality issues plaguing Copilot. The article noted that "current and former employees who have worked on Microsoft's AI products" had said "[c]onfusing brand positioning and interoperability problems have frustrated users[.]" The article also claimed that these problems led Copilot to lose market share to its competitors, such as Google's Gemini, during the Relevant Period, and that "[o]nly a small proportion of subscribers to Microsoft's enterprise suite use Copilot, and the percentage who favor it over Google's Gemini or other tools has decreased in recent months." The article continued:

> Previously unreported data shows that Copilot subscribers, including those with corporate accounts, are increasingly favoring competing options.
>
> From last July through late January, the percentage of Copilot subscribers who use the product as a primary option decreased from 18.8% to 11.5%, according to a survey of more than 150,000 respondents in the U.S. by market research



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

firm Recon Analytics. This happened while the share of paid users who choose Google's Gemini as the first option increased from 12.8% to 15.7%.

* * *

Those surveyed who switched from Copilot said they found better quality elsewhere, with some citing poor user experience and restrictive usage limits. Workers who have access to subscriptions for Copilot, ChatGPT and Gemini choose ChatGPT and Gemini at a higher rate than Copilot, the Recon data shows.

Some companies are using only about 10% of the Copilot subscription seats they are paying for, according to a recent note by analysts at Citi Research. "Disorganized data silos" have been an issue for Copilot, analysts wrote.

* * *

Customer surveys by Microsoft have shown that users have been confused by the multiple versions of Copilot, people familiar with the matter said. Some users have long complained about Copilot being forced onto them, popping up on everything from documents to the browser.

One issue cited by current and former employees is the lack of a cohesive experience across the different Copilots, a user pain point Nadella has flagged in the past. About a year ago, Nadella sent a frustrated email to Rajesh Jha, executive vice president of experiences and devices, detailing an incident in which Nadella had asked the enterprise version of Copilot on the Edge browser to help with a public webpage he was on, but it couldn't fulfill his prompt, according to people familiar with the email.

* * *



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

> Some employees said an organizational silo between Suleyman's consumer-focused team and teams working on enterprise versions has made it challenging to achieve a unified vision.
>
> The effort to train proprietary models has also been hampered by a shortage of computing capacity, with the company rationing server time to ensure availability for OpenAI and other customers of its Azure cloud service. On a number of benchmark tests, Microsoft's flagship proprietary AI model ranks well below competitors.

116. Microsoft's share price continued to drop after *The Wall Street Journal*'s February 2, 2026 article, falling below $393 per share on February 5, 2026.

117. In a February 11, 2026 research note, analysts at Melius Research LLC connected the Company's decision to divert CPU and GPU capacity from Azure to the apparent flaws in Copilot. Opining that "Copilot Woes and Azure are Linked," the analysts wrote that Microsoft was in a "no-win situation" in which "the better the AI assistants get from competitors, the more Microsoft will seem behind in Copilot and its other AI tools – and then will need to spend more to invest in them, consuming the upside in Azure for their own purposes."

118. Then, on March 17, 2026, *The Wall Street Journal* published another article that revealed that Microsoft was reorganizing its Copilot product teams, unifying the groups working on the commercial and consumer versions of Copilot partly in response to the challenges revealed by *The Wall Street Journal*'s prior reporting.

119. Meanwhile, Microsoft's share price continued to plummet, reaching a low of $380 per share by March 20, 2026 – 30% below its highest point between May 1, 2025 and January 28, 2026.

120. Microsoft announced a further increase to its planned capital expenditures on April 29, 2026, when it disclosed its results for the third quarter of fiscal year 2026 ("3Q 2026"). On the accompanying earnings call, defendant Hood stated that total capital expenditures for calendar year 2026 would be $190 billion, $37 billion more than analyst expectations.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

121. On June 2, 2026, Microsoft's CFO of Commercial Products and Infrastructure, Mat McBride ("McBride"), spoke at the Evercore TMT Conference, where he was asked about the "perception that Copilot's not delivering what people want." In response, McBride stated the Company had been working to "improve[] the product rapidly over the last year," which included the launch of "625 new features," such that the "product is way different than it was 90 days ago."

122. However, Copilot has continued to lose market share according to third-party tracking services. Data from First Page Sage, a self-described search engine optimization and "thought leadership marketing company[,]" shows that Copilot has fallen from the second most used generative AI chatbot to the fourth most used generative AI chatbot in the past year, dropping from a 14.3% market share as of June 2025 to an 8.7% market share as of June 2026.

## AN INVESTOR FILES A SECURITIES CLASS ACTION

123. On June 12, 2026, a purported purchaser of Company stock filed the Securities Class Action in the United States District Court for the Western District of Washington against Microsoft and defendants Nadella, Hood, Spataro, and Jha. The operative complaint in the Securities Class Action alleges that throughout the class period of May 1, 2025 to January 28, 2026, the defendants made materially false and/or misleading statements, failing to disclose material adverse facts pertaining to the Company's business, operations, and financial condition.

124. Specifically, the complaint alleges that the defendants failed to disclose to investors: (a) that Microsoft's Copilot family of products had experienced significant brand positioning, user experience, usage, data siloing, computational capacity, organizational, and interoperability problems; (b) that Microsoft's flagship proprietary AI model ranked well below competitors on a number of benchmark tests; (c) that Microsoft needed to increase by billions of dollars its capital expenditures and divert GPU and CPU capacity away from fulfilling demand for its profitable Azure services in order to improve the competitive positioning of its critical Copilot family of products and increase its AI-related R&D; and (d) that, as a result of the foregoing, Microsoft had failed to convert



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

a significant percentage of its commercial Microsoft 365 users to paid Copilot subscriptions and the Company's Copilot offerings had lost market share to rival products, a trend that was increasing.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**
**DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO MICROSOFT**

125. As a result of the Individual Defendants' improprieties, Microsoft approved massive investments in other LLM developers, including OpenAI, and participated in the unlawful misappropriation of copyrighted material, as well as disseminated improper public statements concerning the Company's operations, prospects, and internal controls. This misconduct has devastated Microsoft's credibility.

126. As a direct and proximate result of the Individual Defendants' actions, Microsoft has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action and Copyright Actions.

127. As a direct and proximate result of the Individual Defendants' actions as alleged above, Microsoft's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

128. Lastly, the actions of the Individual Defendants have irreparably damaged Microsoft's corporate image and goodwill. For at least the foreseeable future, Microsoft will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Microsoft's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

129. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

130. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

131. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

132. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

133. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Microsoft and was at all times acting within the course and scope of such agency.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

134. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

135. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

136. Plaintiff is an owner of Microsoft common stock and has been an owner of Microsoft common stock since the wrongdoing alleged herein.

137. Plaintiff has hired counsel experienced in conducting derivative litigation and will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

***Demand Is Futile Because a Majority of the Board Faces a Substantial Likelihood of Personal Liability***

138. At the time Plaintiff commenced this action, the Board consisted of 13 members – defendants Nadella, Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzker, Rainey, Scharf, Stanton, and Walmsley (the "Director Defendants") and non-defendant Carmine Di Sibio. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

139. The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Microsoft's business, operations, prospects, internal controls, and financial statements.

140. The Director Defendants also face a substantial likelihood of liability arising out of their role in approving and continuing to authorize massive reciprocal investments with OpenAI and failing to correct the Company's participation in the unlawful misappropriation of copyrighted material to train OpenAI's LLMs. As the 2025 Proxy Statement makes clear, the Director Defendants maintain direct oversight over Microsoft's AI strategy risk and receive and provide feedback on regular updates from management regarding Microsoft's AI-related initiatives, including its partnership with OpenAI. Under the Director Defendants' supervision, Microsoft has designed and



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

built a bespoke Azure supercomputing environment specifically for OpenAI, which it continues to engineer and operate in collaboration with OpenAI during the training process. The Director Defendants knew, or were reckless in not knowing, that Microsoft was exposing itself to a substantial risk of liability for the unlawful misappropriation of copyrighted material arising out of its partnership with OpenAI.

141. Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the misconduct discussed above. This misconduct has subjected the Company to a significant risk of liability arising out of the Securities Class Action and the Copyright Actions.

142. Here, the Director Defendants failed to implement adequate internal controls and measures to prevent the wrongdoing suffered by the Company. Among other things, Microsoft has no Board-level committee charged with evaluating and managing risks to the Company and no system for ensuring that mission-critical information was provided directly to the Board, rather than being syphoned through the Company's management. To the contrary, the 2025 Proxy Statement makes clear that the "Board relies upon senior management to supervise risk management activities within the Company."

143. The Director Defendants face a substantial likelihood of personal liability because of their participation in and authorization of massive investments in LLM developers, including OpenAI, and participation in and/or failure to correct Microsoft's participation in unlawful misappropriation of copyrighted material, their conscious and knowing authorization of false and misleading statements, including those contained in the 2025 Proxy Statement, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

144. The Director Defendants will not bring suit on behalf of Microsoft to assert the claims asserted herein themselves, because to do so would mean exposing themselves to this substantial likelihood of liability. As such, Plaintiff's making a demand on the Board to litigate this matter would be futile.

***The Audit Committee Defendants Face an Even Greater Likelihood of Personal Liability***

145. The Audit Committee Defendants, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

***The Governance Committee Defendants Face an Even Greater Likelihood of Personal Liability***

146. The Governance Committee Defendants, as members of the Governance Committee during the Relevant Period, were placed in their roles because of their substantial training and experience on corporate governance matters and the importance of accurate disclosures to the investing public. Instead of discharging their duties properly, the Governance Committee Defendants failed to implement adequate internal controls and take other necessary actions to address the misconduct complained of herein. Therefore, the Governance Committee Defendants face a



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

substantial likelihood of personal liability and cannot exercise disinterested business judgment in considering a demand to initiate and prosecute this action.

***The Compensation Committee Defendants Face an Even Greater Likelihood of Personal Liability***

147. The Compensation Committee Defendants, as members of the Compensation Committee during the Relevant Period, knowingly disregarded their duties to oversee and, as appropriate, determine the annual salaries and other compensation of the Company's executive officers, assist and recommend to the Board appropriate compensation policies and practices, and approve appropriate performance bonuses. Instead, the Compensation Committee Defendants approved unwarranted bonuses and compensation to the Company's executives by disregarding executives' lack of performance and participation in unlawful activity, including artificially inflating the Company's share price. Therefore, the Compensation Committee Defendants face a substantial likelihood of personal liability and cannot exercise disinterested business judgment in considering a demand to initiate and prosecute this action.

***Defendant Nadella Lacks Independence***

148. Defendant Nadella is not an independent director because his principal occupation is CEO of Microsoft. According to the 2025 Proxy Statement, defendant Nadella is eligible for an annual base salary of $2,500,000 and additional performance-based awards. In FY 2025, Nadella earned $96,496,790 in total compensation, a 22% increase from his compensation in fiscal year 2024. This amount is material to defendant Nadella, and therefore, he would not be able to impartially consider a demand against the "independent members" of Microsoft's Board, which currently includes defendants Hoffman, Johnston, List, MacGregor, Mason, Peterson, Pritzker, Scharf, Stanton, and Walmsley, who approve his executive compensation, and the Compensation Committee Defendants, who were responsible for recommending his compensation to the independent members of the Board at all relevant times.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

149. Additionally, defendant Nadella is named as a defendant in the Securities Class Action, and is further incapable of considering a demand to commence and vigorously prosecute this action because he faces an additional substantial likelihood of liability arising out of that lawsuit, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act as well as SEC Rule 10b-5 promulgated under the Exchange Act. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to defendant Nadella's willful and/or reckless violations of his obligations as an officer and director of Microsoft.

150. Accordingly, demand is futile as to Defendant Nadella.

**FIRST CAUSE OF ACTION**

**Against the Individual Defendants for Breach of Fiduciary Duties**

151. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

152. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Microsoft's business and affairs.

153. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

154. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Microsoft.

155. In breach of their fiduciary duties owed and owing to Microsoft, the Individual Defendants willfully or recklessly authorized or permitted Microsoft to enter into massive reciprocal investment partnerships with LLM developers, including OpenAI, and participated in and/or failed to correct the Company's engagement in unlawful misappropriation of copyrighted material.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

156. In further breach of their fiduciary duties owed and owing to Microsoft, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose to investors, among other things, that: (i) Copilot was experiencing significant problems with brand positioning, user experience, usage, data siloing, computational capacity, organizational, and interoperability; (ii) Copilot was not a market leader, but in fact was substantially behind its competitors as measured by numerous benchmark tests; (iii) Microsoft had failed to convert a significant percentage of its commercial Microsoft 365 users to paid Copilot subscriptions and Copilot was increasingly losing market share to rival products; and (iv) because of Copilot's inferior competitive positioning, Microsoft was diverting billions in capital expenditures and CPU and GPU capacity towards Copilot and AI-related research and development and away from fulfilling demand for its profitable Azure services. As a result, the Individual Defendants' positive statements between May 1, 2025 and January 28, 2026 about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

157. Accordingly, Microsoft's public statements were materially false, misleading, and lacked a reasonable basis between May 1, 2025 and January 28, 2026, thereby causing the stock to trade at artificially inflated prices.

158. The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

159. The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

160. The Individual Defendants had actual or constructive knowledge that the Company participated in the unlawful misappropriation of copyrighted material and issued materially false and misleading statements, and they failed to correct the Company's wrongdoing. The Individual



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them. Such wrongdoing was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

161. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent and/or unlawful schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent and/or unlawful schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

162. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

163. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Microsoft has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**

**Against the Individual Defendants for**
**<u>Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9</u>**

164. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

165. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

166. The 2025 Proxy Statement violated Section 14(a) and Rule 14a-9 because it solicited Microsoft stockholder votes for, among other things, director reelection and the 2026 Stock Plan, while simultaneously misrepresenting and/or failing to disclose the Company's actual business, operations, and prospects.

167. The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9. By virtue of their positions within the Company and roles in the process and in the preparation of the 2025 Proxy Statement, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2025 Proxy Statement.

168. The Individual Defendants knew that the statements contained in the 2025 Proxy Statement were materially false and misleading.

169. The omissions and false and misleading statements in the 2025 Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors. Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2025 Proxy Statement and in other information reasonably available to stockholders.

170. As a direct and proximate result of the dissemination of the false and misleading 2025 Proxy Statement that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, Nominal Defendant Microsoft suffered damages and actual economic losses in an amount to be determined at trial.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

**THIRD CAUSE OF ACTION**

**Against the Individual Defendants for Unjust Enrichment**

171. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

172. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Microsoft.

173. The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Microsoft that was tied to the performance or artificially inflated valuation of Microsoft, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

174. Plaintiff, as a stockholder and representative of Microsoft, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

175. Plaintiff, on behalf of Microsoft, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**Against the Individual Defendants for Waste of Corporate Assets**

176. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

177. As set forth above, the Individual Defendants disseminated or approved the dissemination of materially false and misleading statements while also failing to disclose material facts necessary to make the statements made not misleading under the circumstances.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

178. The Individual Defendants knew or recklessly disregarded facts showing that these statements were false and misleading because they received or had access to such information.

179. As a result of the Individual Defendants' making these materially false and misleading statements or permitting them to be made, Microsoft's common stock traded at artificially inflated prices between May 1, 2025 and January 28, 2026.

180. As discussed above, the Company spent roughly $14.5 billion purchasing nearly 30 million shares of Microsoft common stock at artificially inflated prices between May 1, 2025 and January 28, 2026, when it should have spent no more than $12,855,196,272 for that number of shares.

181. Accordingly, the Company has suffered damages because it paid artificially inflated prices for Microsoft common stock.

182. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

183. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

184. Plaintiff, on behalf of Microsoft, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

185. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186. Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Defendants are in breach of their fiduciary duties to Microsoft and has participated in a conspiracy in breach of fiduciary duties.



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

187. In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

188. The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

189. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

190. Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

191. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Microsoft and that Plaintiff is a proper and adequate representative of the Company;



YANICK LAW & DISPUTE RESOLUTION PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C. Awarding prejudgment interest to the Company;

D. Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 5, 2026

Respectfully submitted,

**YANICK LAW & DISPUTE RESOLUTION PLLC**

/s/ *Miles A. Yanick*
Miles A. Yanick (WSBA #26603)
1325 Fourth Avenue, Suite 1130
Seattle, WA 98101
Telephone: (206) 455-5924
Email: myanick@yanicklaw.com

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato (*pro hac vice* forthcoming)
580 California Street, Suite 1200
San Francisco, CA 94104
Telephone: (415) 341-9980
Email: fortunato@bespc.com

*Attorney for Plaintiff*

## VERIFICATION

I, Subash Subramanian, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Microsoft Corporation, and authorize its filing. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further declare that I am a current holder of Microsoft stock and have continuously held Microsoft stock from the time of the wrongdoing alleged herein until the present. I declare under penalty of perjury that the foregoing is true and correct.

09/26/26
Date

Subash Subramanian



CS Scanned with CamScanner